2008 ND 77

**Monte SANDVICK and Joedy Bragg,
Plaintiffs and Appellants**

v.

**William R. LaCROSSE; Frank B.
Haughton, Jr.; Empire Oil Company;
Nisku Royalty, L.P.; FH Petroleum
Corporation; and Tammy LaCrosse,
Defendants and Appellees**

No. 20070146.

Supreme Court of North Dakota.

April 18, 2008.

Rehearing Denied May 22, 2008.

Michael T. Andrews (appeared), H. Patrick Weir (argued), and David L. Tilden (on brief), Vogel Law Firm, Bismarck, N.D., for plaintiffs and appellants.

Patrick W. Durick (argued) and Larry L. Boschee (on brief), Pearce & Durick, Bismarck, N.D., for defendants and appellees.

SANDSTROM, Justice.

[¶ 1]   Monte Sandvick and Joedy Bragg appeal the district court judgment dismissing their lawsuit against William LaCrosse and Frank Haughton following a bench trial in which the court found neither a partnership nor a joint venture existed between the parties in regard to oil and gas leases held by the parties.  We reverse and remand, concluding on the basis of the facts found by the district court that there was a joint venture and that LaCrosse and Haughton breached their fiduciary duties of loyalty to Sandvick and Bragg.

I

[¶ 2]   In May 1996, Sandvick, Bragg, LaCrosse, and Haughton purchased three oil and gas leases in Golden Valley County, North Dakota.  The leases were known as the Horn leases.  The Horn leases were standard, paid-up leases with terms of five years and did not contain any provision for extending or renewing them.  Empire Oil Company, owned by LaCrosse, held record title to the leases.  The leases were purchased from the parties' credits in the Empire Oil Company JV checking account.  Sandvick testified the parties' initial intent was to try to sell the leases during the five-year term.

[¶ 3]   Aside from the Horn leases, the parties had previously owned other oil and gas leases together.  Haughton had owned other leases with Sandvick, and LaCrosse was also involved in some of these other leases.  Some of the leases were purchased before the Horn leases, and some were purchased after.

[¶ 4]   In November 2000, Haughton and LaCrosse purchased three oil and gas leases on the Horn property.  These leases

were referred to as the "Horn Top Leases" and were set to begin at the expiration of the initial Horn Leases. The term "top lease" is defined in Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 1285 (8th ed.1991), as a "lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." The top leases covered the same acreage as the Horn Leases and had a five-year term, with the title in the name of Empire Oil Company. The top leases were not recorded until December 2001. Prior to purchasing the top leases, LaCrosse and Haughton twice offered to purchase Sandvick's and Bragg's interests in the Horn leases, but Sandvick and Bragg refused. Haughton testified he did not inform either Sandvick or Bragg that he and La-Crosse had purchased the top leases.

[¶ 5] In 2004, Sandvick and Bragg sued LaCrosse and Haughton, claiming they breached their fiduciary duties by not offering Sandvick and Bragg an opportunity to purchase the top leases with them. The trial was limited to the issues regarding the existence, life span, and scope of a partnership or joint venture. Following the bench trial, the district court concluded no partnership or joint venture existed.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal is timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

[¶ 7] On appeal, Sandvick and Bragg argue the district court erred in concluding the parties were not partners. In North Dakota, a partnership is "an association of two or more persons to carry on as co-owners a business for profit."

N.D.C.C. § 45–13–01(19). The crucial elements of a partnership are (1) an intention to be partners, (2) co-ownership of the business, and (3) a profit motive. *Tarnavsky v. Tarnavsky*, 2003 ND 110, ¶ 7, 666 N.W.2d 444. "The existence of a partnership is a mixed question of law and fact, and the ultimate determination of whether a partnership exists is a question of law." *Id.* Questions of law are fully reviewable on appeal. *J.P. v. Stark County Social Services Bd.*, 2007 ND 140, ¶ 9, 737 N.W.2d 627.

[¶ 8] The district court concluded a partnership did not exist between the parties. In its memorandum opinion following trial, it found the parties were not co-owners of a business. It found the parties' undertaking was very limited and did not coincide with the definition of a business. It found that the parties entered into the leases for a set period of time and that their activity, rather than being a series of acts, was limited to that occurrence.

[¶ 9] Under comment 1 to § 202 of the Revised Uniform Partnership Act, a "business" is defined as "a series of acts directed toward an end," and under N.D.C.C. § 45–13–01(4), "includes every trade, occupation, and profession." North Dakota adopted the Revised Uniform Partnership Act in 1995, *Ziegler v. Dahl*, 2005 ND 10, ¶ 14, 691 N.W.2d 271, and it is codified in N.D.C.C. chapters 45–13 through 45–21. We interpret uniform laws in a uniform manner, N.D.C.C. § 1–02–13, and may also look to the drafters' comments to interpret its provisions. *See, e.g., Estate of Zimmerman*, 2001 ND 155, ¶ 14, 633 N.W.2d 594.

[¶ 10] In this case, the parties entered into the Horn leases for a specific period. The court found their intention was to try to sell the leases. The court also found

the parties were involved in other oil- and gas-related undertakings with various other parties, including, in some instances, the parties involved in this case. Haughton testified that he had jointly owned other leases with LaCrosse and Sandvick. Bragg testified the Horn leases were a separate investment. The court found these other undertakings were separate and apart from the Horn leases. We conclude the purchase of the Horn leases was a separate act undertaken by the parties, not a series of acts. On the basis of the evidence in the record and the testimony at trial, we conclude the district court did not err in concluding a partnership did not exist.

## III

[¶ 11] Sandvick and Bragg argue the district court erred in concluding a joint venture did not exist. A joint venture is similar to a partnership but is more limited in scope and duration, and principles of partnership law apply to the joint venture relationship. *SPW Associates, LLP v. Anderson*, 2006 ND 159, ¶ 8, 718 N.W.2d 580. "For a business enterprise to constitute a joint venture, the following four elements must be present: (1) contribution by the parties of money, property, time, or skill in some common undertaking, but the contributions need not be equal or of the same nature; (2) a proprietary interest and right of mutual control over the engaged property; (3) an express or implied agreement for the sharing of profits, and usually, but not necessarily, of losses; and (4) an express or implied contract showing a joint venture was formed." *Id.* at ¶ 10 (citations omitted). There is, however, no fixed formula for identifying the joint venture relationship in all cases, and each case will depend upon its own unique facts. *Id.*

[¶ 12] The district court concluded the parties were not members of a joint venture when they acquired the Horn leases. It made the following findings of fact, which supported its conclusion:

7. Bragg never talked to Haughton about the investment in the Horn Leases and had no agreement with Haughton concerning the purchase of additional leases, the purchase of Horn minerals, or the purchase of leases on minerals adjacent to the Horn property. Sandvick had no written or oral agreement with either Haughton or Lacrosse concerning the acquisition of a new lease following the expiration of the Horn Leases.

8. At the time of the acquisition of the Horn Leases, Bragg had no agreement with Lacrosse concerning the development of those leases. Lacrosse never agreed to make Sandvick and Bragg a part of any subsequent lease of the Horn minerals. If Bragg had any expectations concerning the development of the Horn Leases, they were not communicated to Haughton.

. . . .

10. No agreement was entered into, express or implied, limiting the parties' abilities to continue activity which did not include the other parties to these proceedings.

11. None of the parties intended to be exclusively involved in this undertaking, and they knew that the other parties would continue to do business which would not include them.

. . . .

13. Under the circumstances, the parties had no expectations that the other parties would refrain from investing in the area without offering to the other

parties an opportunity to join in the investment.

[¶ 13] The court, however, also made findings that reflected a joint venture; specifically, the court found: (1) LaCrosse opened a checking account under the name Empire Oil JV Account; (2) the leases were purchased from the parties' credits in the Empire Oil Company JV account in equal shares; (3) title to the leases was held in Empire Oil Company's name; and (4) the parties' intent in acquiring the leases was to sell them. At trial, Bragg, La-Crosse, and Haughton testified that any profits would have been shared had the Horn leases been sold. This testimony, along with the court's findings above, demonstrates the existence of a joint venture. We conclude a joint venture did exist in regard to the parties' purchase of the Horn leases, because the leases were purchased out of the parties' checking account funds in equal shares, they were titled in Empire Oil's name rather than each of the parties' names, and profits were going to be shared if the leases were sold.

## IV

[¶ 14] Having concluded a joint venture exists, we look to the scope of the venture and decide whether any fiduciary duties were breached by LaCrosse and Haughton. "The existence and scope of a fiduciary duty depends upon the language of the parties' agreement." *Grynberg v. Dome Petroleum Corp.*, 1999 ND 167, ¶ 21, 599 N.W.2d 261. "[P]rinciples of partnership law apply to the joint venture relationship." *Anderson*, 2006 ND 159, ¶ 8, 718 N.W.2d 580.

[¶ 15] Under N.D.C.C. § 45–16–04(1), a partner owes duties of loyalty and care to the other partners. The duty of loyalty is set forth in N.D.C.C. § 45–16–04(2):

a. To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

b. To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

c. To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

[¶ 16] "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty." *Svihl v. Gress*, 216 N.W.2d 110, 115 (N.D.1974) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928)); *see also* 2 Williams & Meyers, *Oil and Gas Law* § 437.1 (2007) ("Each party has the right to demand and expect from his associates full, fair, open, and honest disclosure of everything affecting the relationship. One party may not exclude his associates from an interest in properties which are the subject matter of the joint venture by purchasing it for his individual account, ... if he does acquire such antagonistic interest he must account to the other participants in the joint venture therefore.").

[¶ 17] In this case, the scope of the venture was to purchase and then attempt to sell the Horn leases. Approximately six months prior to the expiration of the leases, LaCrosse and Haughton purchased oil and gas leases, known as top leases, that were set to begin upon the expiration of

the Horn leases. The top leases were nearly identical in all respects to the original Horn leases. The top leases had the same duration and acreage and were titled in Empire Oil Company's name. An important difference, however, between the original leases and the top leases was that Sandvick and Bragg were not informed of the acquisition of the top leases.

[¶ 18] Although the original Horn leases did not contain an extension or renewal provision, the top leases purchased by La-Crosse and Haughton were effectively extensions of the original Horn leases. *See Reynolds–Rexwinkle Oil, Inc. v. Petex, Inc.*, 268 Kan. 840, 1 P.3d 909, 920–921 (2000) (holding a substantially identical top lease taken while the initial lease was still in effect to be an extension and renewal of the initial lease); 5 Eugene Kuntz, *Oil and Gas* § 63.2, at 230 (1991) ("It has been held that a new lease acquired from the lessor by the lessee while the old lease is in effect ... is an extension of the lease....").

[¶ 19] LaCrosse and Haughton created a conflict of interest by purchasing the top leases prior to the expiration of the original leases without notifying Sandvick and Bragg. It was in LaCrosse's and Haughton's best interest not to sell the original leases during the remaining six months of the original term. Having excluded Sandvick and Bragg, LaCrosse and Haughton potentially stood to benefit more by waiting to sell the leases until after the original term expired. We conclude LaCrosse and Haughton breached their fiduciary duties of loyalty by taking advantage of a joint venture opportunity when they purchased the top leases without informing Bragg and Sandvick. *See Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 548 (1928) (holding a co-venturer breached his duty of loyalty when he extended the lease on commercial property and excluded his co-venturer from the opportunity). Bragg and Sandvick should have had an opportunity to purchase the top leases with La-Crosse and Haughton.

## V

[¶ 20] The district court did not address damages, because it found no joint venture. On remand, the court must consider the extent of damages owed to Sandvick and Bragg. At trial, Haughton testified that oil is currently being produced on the Horn lease acreage. Damages should be limited to revenue generated from the oil production on the acreage covering the Horn leases.

## VI

[¶ 21] The district court judgment is reversed and remanded for further proceedings consistent with this opinion.

[¶ 22] GERALD W. VANDE WALLE, C.J., and BRUCE E. BOHLMAN, S.J., and MARY MUEHLEN MARING, J., concur.

[¶ 23] The Honorable BRUCE E. BOHLMAN, Surrogate Judge, sitting in place of KAPSNER, J., disqualified.

CROTHERS, Justice, concurring in part and dissenting in part.

[¶ 24] I concur with Part II of the Majority Opinion affirming the district court's findings and conclusion that the parties were not partners. I respectfully dissent from Parts III and IV where the Majority overlooks the district court's findings of fact and, therefore, overtakes the district court's fact-finding role.

[¶ 25] The hallmark of a joint venture is that parties pool financial resources and share control to accomplish a for-profit, limited-time event. *See SPW Associates, LLP v. Anderson*, 2006 ND 159, ¶ 10, 718 N.W.2d 580. This Court has recognized,

"There is, however, no definite formula for identifying the joint venture relationship in all cases, and each case will depend upon its own unique facts." *Id.*

[¶ 26] Overlooking this "no one size fits all" admonition, the Majority concludes a joint venture arose out of the Horn lease purchase based on facts the Majority found more persuasive. Majority Opinion at ¶ 13. In the process, the Majority lists, and then casts aside as apparently less persuasive, the district court's findings which the Majority agreed supported the district court's conclusion that no joint venture existed. *Id.* at ¶ 12. I submit the Majority's actions ignore our "clearly erroneous" standard of review and usurp the district court's fact-finding role. *See Klein v. Larson,* 2006 ND 236, ¶ 35, 724 N.W.2d 565 (Crothers, J., concurring in part and dissenting in part) ("[W]e will not retry the case or substitute our judgment for the district court's if its determination is supported by evidence in the record.").

[¶ 27] Even accepting that the present facts require the conclusion that a joint venture was created, the Majority's ultimate decision that liability attaches to the "top leasing" activity is unpersuasive. Rather, North Dakota law allows partners (and therefore joint venturers) to limit the scope of their duty of loyalty to the remaining partners. N.D.C.C. § 45–13–03(2). This public policy is consistent with other jurisdictions examining the question in the context of mineral development. *See* Christopher Lane and Catherine J. Boggs, *Duties of Operator or Manager to Its Joint Venturers,* 29 Rocky Mountain Mineral Law Institute 199, 228–29 (1984). This also means that, under North Dakota law, the parties could have limited their duty of loyalty. Nevertheless, the Majority presumes without question that the full duty of loyalty existed, and that it formed a basis for liability in this case. *See* Majority Opinion at ¶¶ 15–16.

[¶ 28] There was no written contract in this case. The parameters of the transaction were unclear. A full trial occurred, with many witnesses testifying about their understanding of the business arrangement. From this, the district court made specific findings regarding the nature of the parties' enterprise, and the scope of their duties to each other:

"7. Bragg never talked to Haughton about the investment in the Horn Leases and had no agreement with Haughton concerning the purchase of additional leases, the purchase of Horn minerals, or the purchase of leases on minerals adjacent to the Horn property. Sandvick had no written or oral agreement with either Haughton or LaCrosse concerning the acquisition of a new lease following the expiration of the Horn Leases.

"8. At the time of the acquisition of the Horn Leases, Bragg had no agreement with LaCrosse concerning the development of those leases. LaCrosse never agreed to make Sandvick and Bragg a part of any subsequent lease of the Horn minerals. If Bragg had any expectations concerning the development of the Horn Leases, they were not communicated to Haughton.

"9. The parties were all involved in other oil and gas related undertakings with various other parties, including, in some instances, the parties that are involved in these proceedings. These undertakings were separate and apart from the Horn Leases.

"10. No agreement was entered into, express or implied, limiting the parties' abilities to continue activity which did not include the other parties to these proceedings.

"11.   None of the parties intended to be exclusively involved in this undertaking, and they knew that the other parties would continue to do business which would not include them.

"12.   Haughton was interested in the area surrounding the Horn Leases and had various leasehold and mineral interests in the area dating from 1991. Sandvick, Bragg, and LaCrosse were aware of these facts and had reason to believe that he would continue to invest in the area.

"13.   Under the circumstances, the parties had no expectations that the other parties would refrain from investing in the area without offering to the other parties an opportunity to join in the investment."

Rather than ignoring the district court's findings, our standard of review requires that we respect the trier of fact's ability to see the witnesses, hear the testimony, and determine the scope of the obligations at issue in this case.   I therefore would affirm the district court's judgment.

[¶ 29]   DANIEL J. CROTHERS, J.